UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

BETH ANN MCNEIL,

Plaintiff,

v.

COMMISSIONER OF THE SOCIAL SECURITY ADMINISTRATION,

Defendant.

Case No. 3:11-cv-01144 -ST

OPINION AND ORDER

STEWART, Magistrate Judge:

**INTRODUCTION**

Plaintiff, Beth Ann McNeil ("McNeil"), seeks judicial review of the final decision by the Social Security Commissioner ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("SSA"), 42 USC §§ 401-33. This court has jurisdiction to review the Commissioner's decision pursuant to 42 USC § 405(g).

All parties have consented to allow a Magistrate Judge to enter final orders and judgment in this case in accordance with FRCP 73 and 28 USC § 636(c) (docket # 21). The Commissioner has filed an Amended Motion to Remand for further administrative

proceedings (docket # 17). For the reasons set forth below, that motion is denied and the Commissioner's decision is REVERSED and REMANDED for an award of benefits.

## ADMINISTRATIVE HISTORY

McNeil protectively filed for DIB on August 27, 2008, alleging a disability onset date of March 1, 2008. Tr. 144-46.[1] Her application was denied initially and on reconsideration. Tr. 75-76. On August 17, 2010, a hearing was held before Administrative Law Judge ("ALJ") Richard A. Say. Tr. 38-94. The ALJ issued a decision on August 26, 2010, finding McNeil not disabled. Tr. 11-21. The Appeals Council denied a request for review on July 27, 2011. Tr. 1-3. Therefore, the ALJ's decision is the Commissioner's final decision, subject to review by this court. 20 CFR § 404.981.

## BACKGROUND

Born in 1959, McNeil was age 51 at the time of the hearing before the ALJ. Tr. 6. She has an undergraduate education and past relevant work in marketing research, graphic design, editorial work, and apartment management. Tr. 62, 164-66. McNeil alleges that she is unable to work due to the combined impairments of endolymphatic hydrops, [2] perilymph fistula in right ear, [3] dizziness, vertigo, TMJ, ADHD, and depression. Tr. 173.

///

///

---

[1] Citations are to the page(s) indicated in the official transcript of the record filed on February 23, 2012 (docket # 12).

[2] Also known as Meniere's disease, this is "an inner ear disorder that affects balance and hearing." National Library of Medicine/PubMed Health, "Meniere's disease," available at http://ww.ncbi.nlm.nih.gov/pubmedhealth/PMH0001721/, last visited August 27, 2012.

[3] "An abnormal opening between the air-filled middle ear and the fluid-filled inner ear . . . . The symptoms of perilymph fistula may include hearing loss, dizziness, vertigo, imbalance, motion intolerance, nausea, and vomiting. Usually patients report an unsteadiness which increases with activity and which is relieved by rest." American Hearing Research Foundation, "Perilymph Fistula," available at http://american-hearing.org/disorders/perilymph-fistula/, last visited August 27, 2012.

## I. Medical Records

### A. Dr. Black

Around March of 2008, McNeil developed vertigo "out of the blue" and several days later fell down some stairs and suffered a concussion. Tr. 351. She began treatment with F. Owen Black, M.D., in April 2008. *Id.* Dr. Black diagnosed her with a perilymph fistula, bilateral endolymphatic hydrops, and a possible benign paroxysmal positional nystagmus (BPPN).[4] *Id.* He prescribed total bed rest to allow the fistula to heal. Tr. 49. McNeil completed bed rest on September 28, 2008, but her problems persisted, causing her to limit her activities. Tr. 351. On October 30, 2008, Dr. Black told her not to drive. Tr. 286. On November 18, 2008, Fran Landsness, R.N., reported that McNeil had limited tolerance for busy situations and "needs to get the eye exercises down with minimal symptoms before she increases her environmental stress load." Tr. 285.

In December 2008, McNeil developed an upper respiratory infection and the flu, which caused her hydrops to exacerbate. Tr. 570. By February 19, 2009, her symptoms improved after she stopped a stimulant prescription prescribed by another doctor. Tr. 569. She was tolerating increased activity and was able to be up three to four hours without provoking symptoms. *Id.* Dr. Black considered her hydrops stable enough to benefit from memory/cognition therapy. *Id.*

On April 23, 2009, Dr. Black noted that though her symptoms had markedly improved with bed rest, she still suffered from dizziness and disorientation, oscillopsia[5]

---

[4] A form of positional nystagmus, or quick, involuntary eye movements, often comorbid with inner ear disorders. National Library of Medicine/Medline Plus, "Nystagmus," available at http://www.nlm.nih.gov/medlineplus/ency/article/003037.htm, last visited August 27, 2012.

[5] "Oscillopsia is an illusion of an unstable visual world. It is associated with poor visual acuity and is a disabling and distressing condition reported by numerous patients with neurological disorders." National

when walking, fatigue, cognitive problems such as ability to multi-task, forgetfulness, and problems with word-finding and focusing to read. Tr. 351. She could tolerate her time outside of the house for up to three hours but would be fatigued the next day. *Id.* Dr. Black suggested she cut down the amount time spent outside the house and then gradually increase it over time. *Id.*

On August 18, 2009, she reported to Dr. Black that symptoms of dizziness and disorientation persisted along with imbalance. Tr. 562. He reported that "she is quite cognitively disrupted. She states that she cannot concentrate long enough to complete insurance papers," is confused and looks up the wrong telephone numbers. *Id.* She described her "bad day" as unable to complete self-care or activities of daily living. *Id.* On a "good day" she "still is limited by perilymph fistula symptoms," "has difficulty multi-tasking," and has impaired cognitive skills ("can't recall issues and items that were before her 15 minutes prior"). *Id.*

In September 2009, Dr. Black stated that McNeil's "perilymph fistula symptoms have markedly improved," but "she has a documented endolymphatic hydrops in her right ear . . . this is consistent with her fluctuating symptoms, particularly the dizziness, disorientation, fullness in her ear, imbalance, and tinnitus." Tr. 560.

As of January 21, 2010, Dr. Black noted that McNeil's "main problem is persistent dizziness" and that "her main symptoms are coming from her hydrops, possibly in association with migraine." Tr. 558. He completed a capacity assessment and concluded McNeil was not capable of work "on a consistent and reliable basis." Tr. 392.

---

Center for Biotechnology Information, "Oscillopsia: causes and management," available at http://www.ncbi.nlm.nih.gov/pubmed/21102332, last visited August 27, 2012.

On February 16, 2010, Dr. Black noted that McNeil's obstructive sleep apnea had most likely led to re-opening of the perilymph fistula, leading to difficulty walking and severe vertigo. Tr. 557. On March 18, 2010, Dr. Black noted McNeil "initially responded very well to bed rest. However, her symptoms recurred." Tr. 556.

On May 10, 2010, McNeil reported that her symptoms improved after she began tapering off Topamax in February. Tr. 554. However, she continued to experience "dizziness and disorientation, imbalance, tinnitus, fullness and pressure in her ears, and sensitivity to movement in her visual field." *Id.* By June 22, 2010, her sleep apnea was under good control with the CPAP machine. Tr. 573. She reported that her symptoms had been inactive over the past few days, which she attributed to a stable barometer. *Id*. Upon learning that McNeil wanted to attend her daughter's graduation from college in Idaho, Dr. Black encouraged her to find someone to drive her rather than taking a bus. *Id.*

**B. Dr. Erickson**

In February 2009 based on the recommendation of Dr. Black,[6] McNeil began treatment with Ken Erickson, M.D., Ph.D., a psychiatrist. Tr. 569. Dr. Erickson repeatedly documented her difficulties with memory and concentration. Tr. 383 (3/7/09: "cognitive/tracking problems"), 386 (5/12/09: "even mild mental tasks draining [and] her memory is still a big struggle . . . making a strong effort on the mnemonic techniques"), 388 (8/24/09: "cognitive activity greatly tires her"), 381 (2/1/10, "still struggles w/memory despite work on exercises").

[6] McNeil requested this referral in January 2008, but Dr. Black delayed until her hydrops were no longer active. Tr. 570.

In a functional evaluation completed on May 11, 2009, Dr. Erickson found a Global Assessment of Functioning ("GAF") of 40-45 and a "past year" GAF of 40-45.[7] Tr. 391. He indicated that McNeil suffers from impaired immediate and short-term memory, reduced long-term memory, and cognitive impairment. Tr. 389-90. Dr. Erickson concluded that McNeil could not perform in a work setting because she

> [m]akes errors due to memory [and] tracking problems. Confused even routing calls. Fatigues rapidly on mental tasks and error rates go higher. Takes 3 or more times longer to complete ordinary mental tasks [and] then has to recheck [and] re-do because of errors.

Tr. 390.

By August 24, 2009, Dr. Erickson observed that McNeil had improved endurance and slight cognitive improvement with seven more vocabulary words, but was "greatly" tired by cognitive activity. Tr. 388. She continued to improve by October 26, 2009, but was struggling and more symptomatic with vestibular dizziness and fatigue. *Id.* On February 1, 2010, McNeil was seeing a therapist and reported "seeing tiny improvements in memory, but [is] a long way from [her] old self." Tr. 381. Dr. Erickson concluded that she still struggled with memory problems. *Id.*

## II. <u>Hearing Testimony</u>

### A. <u>McNeil's Testimony</u>

McNeil testified at the hearing on August 17, 2010, that on a good day she is able to perform basic self-care activities of bathing, dressing, light housework, and laundry, and can drive a car. Tr. 45-46. She can spend up to three or four hours doing simple errands, which she described as "low-stimulus," including going to the doctor, picking up

---

[7] A GAF score of 41-50 denotes "Serious symptoms...any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job.") *Diagnostic and Statistical Manual of Mental Disorders*, Fourth Edition, p. 34.

prescriptions, and light grocery shopping. Tr. 45. She also spends about an hour each day on the computer, emailing friends or reading current events. *Id.* She does not cook and only prepares simple meals or snacks. Tr. 46.

On a bad day, she has extreme dizziness and motion sensitivity and is unable to do most tasks. *Id.* She may be able to shower but chooses not to because she feels it might be "risky." *Id.* Fatigue sets in after about 15 minutes, and she experiences flu-like symptoms. Tr. 47. Lying down is the only way to alleviate the symptoms. *Id.* If she does not spend bad days laying down, she cannot function because of dizziness. Tr. 48. Her medication for hydrops does not help with the dizziness. *Id.*

McNeil has tried several different therapies including bed rest, which consisted of 22.5 hours a day in bed for six weeks, followed by 18 hours a day in bed for six weeks, and then another six weeks with a lot of house rest. Tr. 49. She also tried vestibular therapy and visual desensitization with Dr. Black. Tr. 50-51.

On an average day she needs to lay down about five times, with the length varying depending on the prior activity. Tr. 53. She can read for 45-60 minutes at a time before needing to rest for about 30 minutes. Tr. 55.

**B. Vocational Expert Testimony**

The ALJ asked the Vocational Expert ("VE") what jobs the following hypothetical individual could perform: 51 years of age with a high school and college education; limited to light exertion level activities; never climb ladders, ropes and scaffolds; occasionally balance, stoop, kneel, crouch and crawl; frequently climb ramps and stairs; and avoid even moderate exposure to hazards. Tr. 63. The VE opined that a hypothetical individual with

this residual functional capacity could perform McNeil's past relevant work of marketing, graphic design, graphics, and editorial work. Tr. 63-65.

The VE also explained that a competitive work environment allows only one day of absence per month. Tr. 69. The need to rest on a fairly frequent basis would not be tolerated. *Id.*

## DISABILITY ANALYSIS

Disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 USC § 423(d)(1)(A). The ALJ engages in a five-step sequential inquiry to determine whether a claimant is disabled within the meaning of the Act. 20 CFR § 404.1520; *Tackett v. Apfel*, 180 F3d 1094, 1098-99 (9th Cir 1999).

At step one, the ALJ determines if the claimant is performing substantial gainful activity. If so, the claimant is not disabled. 20 CFR § 404.1520(a)(4)(i) & (b).

At step two, the ALJ determines if the claimant has "a severe medically determinable physical or mental impairment" that meets the 12-month durational requirement. 20 CFR § 404.1520(a)(4)(ii) & (c). Absent a severe impairment, the claimant is not disabled. *Id.*

At step three, the ALJ determines whether the severe impairment meets or equals an impairment "listed" in the regulations. 20 CFR § 404.1520(a)(4)(iii) & (d); 20 CFR Pt. 404, Subpt. P, App. 1 (Listing of Impairments). If the impairment is determined to meet or equal a listed impairment, then the claimant is disabled.

If adjudication proceeds beyond step three, the ALJ must first evaluate medical and other relevant evidence in assessing the claimant's residual functional capacity ("RFC").

The claimant's RFC is an assessment of work-related activities the claimant may still perform on a regular and continuing basis, despite the limitations imposed by his or her impairments. 20 CFR § 404.1520(e); Social Security Ruling ("SSR") 96-8p, 1996 WL 374184 (July 2, 1996).

At step four, the ALJ uses the RFC to determine if the claimant can perform past relevant work. 20 CFR § 404.1520(a)(4)(iv) & (e). If the claimant cannot perform past relevant work, then at step five, the ALJ must determine if the claimant can perform other work in the national economy. *Bowen v. Yuckert*, 482 US 137, 142 (1987); *Tackett*, 180 F3d at 1099; 20 CFR § 404.1520(a)(4)(v) & (g).

The initial burden of establishing disability rests upon the claimant. *Tackett*, 180 F3d at 1098. If the process reaches step five, the burden shifts to the Commissioner to show that jobs exist in the national economy within the claimant's RFC. *Id*. If the Commissioner meets this burden, then the claimant is not disabled. 20 CFR § 404.1520(a)(4)(v) & (g).

**ALJ'S FINDINGS**

At step one, the ALJ concluded that McNeil has not engaged in substantial gainful activity since March 4, 2008, the date that the application was protectively filed. Tr. 13.

At step two, the ALJ determined that McNeil has the severe impairments of endolymphatic hydrops and right ear fistula. *Id*.

At step three, the ALJ concluded that McNeil does not have an impairment or combination of impairments that meets or equals any of the listed impairments. Tr. 16. The ALJ found that McNeil has the RFC to perform light work, except she can never climb ladders, rope or scaffolds; may only occasionally balance, stoop, kneel, crouch, and crawl;

can frequently climb ramps and stairs; and should avoid even moderate exposure to hazards. *Id.*

Based upon the VE's testimony, the ALJ determined at step four that McNeil's RFC does not preclude her from past relevant work of marketing communications specialist for an insurance company, a community services assistant in the hospital/healthcare industry, a self-employed writing/graphic designer, and a part-time apartment leasing consultant. Tr. 20. Accordingly, the ALJ determined that McNeil was not disabled at any time through the date of the decision. Tr. 21.

**STANDARD OF REVIEW**

The reviewing court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record. 42 USC § 405(g); *Lewis v. Astrue*, 498 F3d 909, 911 (9th Cir 2007). This court must weigh the evidence that supports and detracts from the ALJ's conclusion. *Lingenfelter v. Astrue*, 504 F3d 1028, 1035 (9th Cir 2007), citing *Reddick v. Chater*, 157 F3d 715, 720 (9th Cir 1998). The reviewing court may not substitute its judgment for that of the Commissioner. *Ryan v. Comm'r of Soc. Sec. Admin.*, 528 F3d 1194, 1205 (9th Cir 2008), citing *Parra v. Astrue*, 481 F3d 742, 746 (9th Cir 2007); *see also Edlund v. Massanari*, 253 F3d 1152, 1156 (9th Cir 2001). Where the evidence is susceptible to more than one rational interpretation, the Commissioner's decision must be upheld if it is "'supported by inferences reasonably drawn from the record.'" *Tommasetti v. Astrue*, 533 F3d 1035, 1038 (9th Cir 2008), *quoting Batson v. Comm'r of Soc. Sec. Admin.*, 359 F3d 1190, 1193 (9th Cir 2004); *see also Lingenfelter*, 504 F3d at 1035.

## DISCUSSION

McNeil argues that the ALJ erred by rejecting the opinion of her treating physicians, Drs. Black and Erickson, and by discrediting her. The Commissioner concedes that the ALJ erred with respect to Dr. Black and moves to remand for further proceedings.

The decision whether to remand for further proceedings or for immediate payment of benefits is within the discretion of the court. *Harman v. Apfel*, 211 F3d 1172, 1178 (9th Cir 2000). The issue turns on the utility of further proceedings. A remand for an award of benefits is appropriate when no useful purpose would be served by further administrative proceedings or when the record has been fully developed and the evidence is insufficient to support the Commissioner's decision. *Strauss v. Comm'r of Soc. Sec. Admin.*, 635 F3d 1135, 1138-39 (9th Cir 2011), quoting *Benecke v. Barnhart*, 379 F3d 587, 593 (9th Cir 2004). The court may not award benefits punitively, and must conduct a "credit-as-true" analysis to determine if a claimant is disabled under the Act. *Id* at 1138.

Under the "crediting as true" doctrine, evidence should be credited and an immediate award of benefits directed where "(1) the ALJ failed to provide legally sufficient reasons for rejecting the evidence; (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited." *Id.* The "crediting as true" doctrine is not a mandatory rule in the Ninth Circuit, but leaves the court flexibility in determining whether to enter an award of benefits upon reversing the Commissioner's decision. *Connett v. Barnhart*, 340 F3d 871, 876 (9th Cir 2003), citing *Bunnell v. Sullivan*, 947 F2d 341, 348 (9th Cir 1991) (*en banc*). The reviewing court

declines to credit testimony when "outstanding issues" remain. *Luna v. Astrue,* 623 F3d 1032, 1035 (9th Cir 2010).

## I. Treating Physicians' Opinions

### A. Legal Standard

The weight given to the opinion of a physician depends on whether it is from a treating physician, an examining physician, or a nonexamining physician. More weight is given to the opinion of a treating physician who has a greater opportunity to know and observe the patient as an individual. *Orn v. Astrue*, 495 F3d 625, 632 (9th Cir 2007). If a treating or examining physician's opinion is not contradicted by another physician, the ALJ may only reject it for clear and convincing reasons. *Id*; *Widmark v. Barnhart*, 454 F3d 1063, 1067 (9th Cir 2006). Even if the opinion is contradicted by another physician, the ALJ may not reject it without providing specific and legitimate reasons supported by substantial evidence in the record. *Orn*, 495 F3d at 632; *Widmark*, 454 F3d at 1066.

The opinion of a nonexamining physician, by itself, is insufficient to constitute substantial evidence to reject the opinion of a treating or examining physician. *Widmark,* 454 F3d at 1066 n2. However, it may serve as substantial evidence when it is supported by and consistent with other evidence in the record. *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F3d 595, 600 (9th Cir 1999).

### B. Dr. Black

Although Dr. Black has treated McNeil since April 2008, the ALJ declined to give his opinion regarding McNeil's functional abilities full weight, explaining:

> Although significant improvement has been reported, Dr. Black continues to suggest that the claimant is not able to function. However, his opinion is largely dependent on the claimant's reports of symptoms which, for the reasons discussed above, have been found not

> fully credible. Moreover, Dr. Black's recommendations are characterized as "precautions" and appear to be excessive in the claimant's case. Dr. Black's treatment records reveal the claimant has engaged in more strenuous activities than he has approved, as discussed above, apparently with no adverse effect. The claimant testified at the hearing that she believed Dr. Black approved her to life up to seven pounds one year ago. Dr. Black's records also indicate that the claimant can engage in "incremental" activity, suggesting that her functional abilities should continue to increase.

Tr. 20.

The Commissioner concedes that these are not specific and legitimate reasons for giving little weight to Dr. Black's opinions dated May 5, 2009, and January 25, 2010. As a result, the Commissioner argues that a remand is necessary to determine what impact, if any, a full and proper consideration of these opinions would have on the RFC finding. However, Dr. Black's opinions are not contradicted by any other physician and do not require further development. Thus, those opinions should be credited as true.

First, the ALJ took the medical records out of context by concluding that McNeil's improvement over time means that she is a capable of working. In April 2008, McNeil's severe symptoms required bed rest. Tr. 49. By February 2009, she could stay up for three to four hours before requiring rest, but still experienced "some persistent oscillopsia" and vertigo. Tr. 567, 569. In June 2009, she still suffered symptoms of dizziness, oscillopsia, fatigue, cognitive problems, vertigo, and imbalance. Tr. 563. Her improvement, relative to complete bed rest, does not suggest that she is capable of full-time work.

Second, the ALJ ignored Dr. Black's objective tests which confirmed McNeil's subjective reports of her symptoms. Tr. 20, 555 (3/29/10: "elevated SP/AP ratio . . . indicating an endolymphatic hydrops"), 556 (3/18/10: "positive Moving Platform Pressure Test . . . along with a positive ECOG"), 557 (2/16/10: "repeat Electrocochleography showed

an elevated SP/AP ratio”), 561 (8/26/09: “repeated her Electrocochleography”), 565 (4/23/09: “repeat audiogram shows a slight decrease in low-frequency thresholds”), 566 (4/23/09: “during head movements to the light, her visual acuity drops six lines (very abnormal)”), 276 (5/15/08: audiometry, electrocochleography, conventional positional nystagmus test, vestibular autorotation tests, sensory organization tests, moving platform pressure tests all abnormal).

Third, the ALJ erroneously concluded that Dr. Black’s precautions are “excessive.” In support, the ALJ referenced the single page tip sheets from Dr. Black’s Balance and Hearing Center entitled “Vestibular Precaution Summary” and “Fistula Precautions.” Tr. 353-55. While these tip sheets are general, Dr. Black specifically referenced them as functional restrictions on McNeil and attached them when responding to the Oregon Department of Human Services Disability Determination Services. Tr. 348.

Fourth, the ALJ also concluded that McNeil engaged in “more strenuous activities. . . with no adverse effect.” Tr. 18. For instance, in November 2008, she was able to go out occasionally to have lunch with friends (Tr. 285); in February 2009, she was able to be up for three to four hours without provoking symptoms (Tr. 569); in October of 2009, she reported to Dr. Erickson that she was able to be out of the house for four or five hours at a time, four days a week (Tr. 388); and by March 2010, she engaged in mild exercise on the elliptical machine (Tr. 442). However, Dr. Black also noted some “adverse effects” which the ALJ failed to mention. On March 18, 2010, she reported that her symptoms had recurred. Tr. 556. Also, her symptoms and fatigue worsen as the day progresses or with increased activity. *Id.* If she is too active, she develops a buzzing in both ears. *Id.*

"Where the Commissioner fails to provide adequate reasons for rejecting the opinion of a treating or examining physician, we credit that opinion 'as a matter of law.'" *Lester v. Chater*, 81 F3d 821, 834 (9th Cir 1996), citing *Hammock v. Bowen*, 879 F2d 498, 502 (o9th Cir 1989). Due to the inadequacy of the reasons given by the ALJ to reject Dr. Black's opinion, they must be credited as true.

**C. <u>Dr. Erickson</u>**

The ALJ gave "little weight" to the opinion of McNeil's treating psychiatrist, Dr. Erickson, finding that it:

> is inconsistent with January 2009 neuropsychological testing results which revealed minimal deficits in memory and cognitive function. He reported that the claimant's memory and tracking problems were resulting in difficulty with tasks requiring two or more steps and she fatigued rapidly on mental tasks. However, Dr. Erickson's records reveal improvement in memory function with simple mnemonic processes. He also noted improved endurance in August 2009.

Tr. 14 (internal citations omitted).

The referenced January 2009 neuropsychological testing was performed by Donna C. Wicher, Ph.D., P.C., a psychologist. Tr. 305-10. Dr. Wicher concluded as follows:

> Although she reports subsequent problems with memory and concentration which are gradually improving, her current level of cognitive functioning is relatively intact. As from one subtest on the WMS-III, her memory functioning is otherwise consistent with what would be expected on the basis of her overall level of intellectual functioning. . . . Typically individuals with injuries of a mild nature recover within a matter of weeks or, at most, months, with nearly all individuals showing no evidence of cognitive impairment when administered neuropsychological tests approximately three months after the injury. Consequently, Ms. McNeil would be expected to make a full recovery from her injury and return to her baseline level of functioning. Her current complaints are most likely related more closely to her vestibular dysfunction that [*sic*] the head injury itself.

Tr. 309.

Dr. Wicher suggested that McNeil's symptoms were similar to "mild, chronic depression" and "while undoubtedly frustrating for her, do not rise to the level of diagnosable mental or nervous disorder and should resolve as her medical condition improves." *Id.*

The ALJ correctly noted that Drs. Wicher and Erickson disagree about McNeil's cognitive functioning. However, that disagreement is not a sufficient reason to reject Dr. Erickson's opinion, but simply requires the ALJ to give specific and legitimate reasons to do so.

Contrary to the ALJ's conclusion, Dr. Erickson's records do not reveal that McNeil improved as predicted by Dr. Wicher. He did comment in August 2009 that she had "improved endurance" and that her cognition "improved slightly" with seven new words. Tr. 388. At best, this evidences only a minor improvement. Moreover, Dr. Wicher saw McNeil only once a couple of months before Dr. Erickson and provided no medical documentation to support her conclusion that McNeil should get better in a few weeks or months. The evidence available from Dr. Erickson's subsequent treatment suggests that McNeil did not make a sufficient recovery by May 2009 to return to work (Tr. 390) and still was not fully recovered by February 1, 2010, over a year later (Tr. 381).

Because the ALJ gave inadequate reasons to reject Dr. Erickson's opinion, it, too, must be credited as true.

## II.     Credibility

### A.     Legal Standard

Once a claimant shows an underlying impairment which may "reasonably be expected to produce the pain or other symptoms alleged" and absent a finding of

malingering, the ALJ must provide "clear and convincing" reasons for finding a claimant not credible. *Lingenfelter*, 504 F3d at 1036, citing *Smolen v. Chater*, 80 F3d 1273, 1281 (9th Cir 1996). The ALJ's credibility findings must be "sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony." *Orteza v. Shalala*, 50 F3d 748, 750 (9th Cir 1995), citing *Bunnell*, 947 F2d at 345-46. The ALJ may consider objective medical evidence and the claimant's treatment history, as well as the claimant's daily activities, work record, and observations of physicians and third parties with personal knowledge of the claimant's functional limitations. *Smolen*, 80 F3d at 1284. The ALJ may additionally employ ordinary techniques of credibility evaluation, such as weighing inconsistent statements regarding symptoms by the claimant. *Id.* The ALJ may not, however, make a negative credibility finding "solely because" the claimant's symptom testimony "is not substantiated affirmatively by objective medical evidence." *Robbins v. Soc. Sec. Admin.*, 466 F3d 880, 883 (9th Cir 2006).

Among other factors, the ALJ may consider "inconsistencies either in claimant's testimony or between her testimony and her conduct," as well her daily activities and work record. *Thomas v. Barnhart*, 278 F3d 947, 958-59 (9th Cir 2002) (quotations omitted), citing *Light v. Social Sec. Admin*, 119 F3d 789, 792 (9th Cir 1997). However, "[t]he Social Security Act does not require that claimants be utterly incapacitated to be eligible for benefits." *Fair v. Bowen*, 885 F2d 597, 603 (9th Cir 1989). "[I]f a claimant is able to spend a substantial part of his day engaged in pursuits involving the performance of physical functions that are transferable to a work setting, a specific finding as to this fact may be

sufficient to discredit an allegation of disabling excess pain." *Id*.

**B. Medical Record**

In assessing McNeil's credibility, the ALJ found that her:

> allegations of disabling physical and mental impairments are not fully supported by objective findings on consultative physical examination, the opinion of evaluating psychologist Donna C. Wicher, Ph.D., treatment records which reveal improvement in her symptoms and functioning, and reports of her daily activities.

Tr. 17.

The Commissioner argues that McNeil's most recent medical records indicate improvement. Dr. Black did note on May 11, 2010, that tapering Topomax had improved her symptoms, but added that "she continues to experience dizziness, and disorientation, imbalance, tinnitus, fullness and pressure in her ears, and sensitivity to movement in her visual field." Tr. 554. Having previously concluded that sleep apnea exacerbated her symptoms, he noted in June 2010 how McNeil was able to control her sleep apnea with a CPAP machine. Tr. 556, 573. As previously noted, any improvement for McNeil has been relative. Despite some improvement over time, she still suffers from some of the same symptoms as in earlier years and requires regular rest.

The Commissioner also points out that Dr. Black encouraged her to travel, but takes his advice out of context. Upon learning that she wanted to attend her daughter's out-of-state graduation, Dr. Black only recommended the best way for her to travel. Tr. 573.

Thus, the medical records do not provide a clear and convincing reason to reject McNeil's testimony.

///

///

### C. **Daily Activities**

McNeil reported daily activities of living alone, preparing simple meals, driving short distances, paying her bills, meeting friends for coffee or lunch, using the computer, watching television, doing laundry and performing other light house work. Tr. 307. The ALJ argues that these activities are inconsistent with a finding of disability.

The Commissioner disregards, however, well-established case law. The ability "to assist with some household chores [is] not determinative of disability." *Cooper v. Bowen*, 815 F2d 557, 561 (9th Cir 1987); see also *Vertigan v. Halter*, 260 F3d 1044, 1050 (9th Cir 2001) ("mere fact that a plaintiff has carried on certain daily activities, such as grocery shopping, driving a car, or limited walking for exercise, does not in any way detract from her credibility as to her overall disability"); *Fair*, 885 F2d at 603. Though she can do various activities, she also testified that she is not capable of doing them every day. Two to three days a week are "bad days" in which she limits her activities to alleviate symptoms. Thus, McNeil's activities are not clearly inconsistent with her reported symptoms.

## III. **Conclusion**

After applying the "crediting as true" doctrine, no issues remain. The ALJ failed to provide legally sufficient reasons for rejecting the opinions of Drs. Black and Erickson and for finding McNeil not credible. Both treating physicians opined that McNeil is not capable of full-time work and cannot spend more than three to four hours outside the house. Tr. 351 (Dr. Black), 390 (Dr. Erickson). McNeil testified that she has at least two to three bad days a week in which she is easily fatigued within 15 minutes of getting up. Tr. 47, 54. The VE testified that in a competitive work environment, an employee who missed more than one day of work per month, who needed to lie down frequently or was even 10% less efficient

than a normal employee, would be unable to sustain competitive employment. Tr. 69, 73. Crediting these opinions and testimony as true, no outstanding issues remain that must be resolved before a determination of disability can be made. It is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

**ORDER**

The Commissioner's Amended Motion to Remand (docket # 17) is DENIED, and the Commissioner's decision is REVERSED and REMANDED pursuant to sentence four of 42 USC § 405(g) for an award of benefits.

DATED August 28, 2012.

s/ Janice M. Stewart
Janice M. Stewart
United States Magistrate Judge